h STEVEN R. PLOTKIN, Judge.
Plaintiff, Charles J. Shaw, appeals a trial court judgment granting a Motion for Summary Judgment dismissing his claims for improper rescission and breach of his Employment Agreement with defendants, Hibernia National Bank, N.A., and Hibernia Corporation (hereinafter referred to collectively as “Hibernia”). Shaw also seeks review of four trial court interlocutory orders on discovery matters entered the same day as the written Summary Judgment.[1] Although the interlocutory orders are not subject to appeal, because the issues are closely related to the appeal in this case, we have elected to consider those orders and deny relief in the “Discovery” section of our decision below. For the reasons set forth below, we reverse the Summary Judgment and remand to the trial court for further proceedings.
FACTS
Shaw, who holds a Masters degree in Banking and Finance from the University of Alabama, initially came into the employ of Hibernia in 1973. In |?1981, Shaw became a senior vice president of Hibernia. In 1985, Shaw was named President of Hibernia and was elected to the Bank Board of Directors. Then, in 1988, he was elected to the Corporate Board of Directors. He served as both President and a member of the Board of Directors until July of 1991, when his relationship with Hibernia terminated, as further described below.
On March 19, 1986, Hibernia and Shaw had entered into an Employment Agreement, which was to “continue until the close of business on January 31, 1991.” The agreement also included the following provision:
Commencing on December 31, 1988, the Company [Hibernia] and Executive [Shaw] shall' review the terms of this Agreement with a view to extending this Agreement or entering into a new agreement at the mutual option of the Company and the Executive which will be effective for five years beyond the expiration of the existing agreement.
Thereafter, on October 18, 1988, Hibernia and Shaw entered into a second Employment Agreement, which was to “continue until the close of business on January 31, 1996.” That agreement also contained a provision requiring the parties to review and consider an extension of the agreement on or about December 31,1993.
Section 3 of the October 18, 1988, Employment Agreement, relative to “Termination,” contained the following liquidated damages provision:
(b) In the event that the employment of the Executive is terminated by the Corporation other than for Cause, or in the event that the Corporation materially breaches this Agreement (in which case the Executive shall have the right, but not the obligation, to resign from employment with the Corporation), the Corporation shall pay the Executive, as liquidated damages for wrongful termination or material breach of the Agreement, the following:
h(i) total .future salary payments for the balance of the Employment Period at the rate of the Executive’s annual base salary at the time of such termination or resignation;
*139 (ii) total future incentive compensation payments for the balance of the Employment Period at the rate of the highest annual award received by the Executive during the five calendar years prior to the year in which such termination or resignation occurs, under the Corporation’s Executive Compensation Plan or any similar successor program; and
(iii) except for awards under the Corporation’s Executive Compensation Plan and stock option plans, all benefits and service credit for benefits under all of the employee benefit plans of the Corporation described in Paragraph 2 hereof, specifically including, but not by way of limitation, those benefits and perquisites described in subparagraphs 2(d) and 2(e) hereof, as if still employed under this Agreement during the balance of the Employment Period. If and to the extent that benefits or service credit for benefits provided in accordance with the preceding sentence shall not be payable or provided to the Executive, his dependents, beneficiaries, heirs or estate under any such plan by reason of his no longer being an employee of the Corporation as a result of the termination of the employment or resignation of the Executive under the conditions hereinabove described, the Corporation shall itself pay or provide for payments of such benefits and service credit for benefits to the Executive, his dependents, beneficiaries, heirs or estate.
Despite the fact that Hibernia was under contract with Shaw until January 31, 1996, the relationships between the parties began to break down in the Spring of 1991, eventually culminating in the formal termination of Shaw’s employment with Hibernia in July of 1991. Shaw claims that Hibernia had “constructively terminated” him on May 23, 1991, when he was stripped of his duties. The terms of Shaw’s termination were documented in a July 19, 1991, letter from Thomas A. Ma-silla Jr., Chairman of the Hibernia Board of Directors, which Shaw signed on July 20, 1991, indicating that he “Accepted and agreed.” That letter expressly established Shaw’s termination date “by reason of voluntary resignation” on July 31, 1991, and provided for six-months severance pay in the amount of $148,548, |4plus some other benefits. The letter agreement also stated, in pertinent part, as follows:
This letter and the supplemental letter agreement between you and the Corporation of the same date constitute the entire agreement between you and the Corporation regarding compensation, benefits, or your employment, and supersede all prior, communications, agreements and understandings, written or oral, with respect to your compensation, benefits, or employment and their termination and all related matters. This agreement shall be in complete and final settlement of, and releases the Corporation, its affiliates and all those connected with them, from any and all causes of action or claims in any way related to or arising out of your compensation, benefits, or employment and their termination or pursuant to any federal, state or local employment law, regulation or other requirement (including without limitation causes of action or claims arising under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act) that you have had, now have, or may have, as of the date you sign this agreement.
The events leading up to Shaw’s acceptance of and agreement to the July 19, 1991, termination letter are the subject of great contention between the parties to this appeal, as explained below.
*140 Procedural history
Some four years after he left the employ of Hibernia, on July 22, 1996, Shaw filed suit, claiming improper rescission and breach of his Employment Agreement and seeking liquidated damages. Hibernia had the case removed to Federal Court by petition filed on August 20, 1996, but it was remanded to state court on October 10, 1996. Various exceptions were filed and decided by the trial court in the years following Shaw’s filing of his petition. As a result of those exceptions, Shaw amended his petition three times prior to May 11, 1999, when Hibernia filed the Motion for Summary Judgment that forms the basis of this appeal. That motion was eventually heard on January 14, 2000. The trial court announced her decision [ Rto grant Hibernia’s Motion for Summary Judgment in a hearing on discovery motions held on February 9, 2000. The trial court’s written judgment granting the motion was issued on March 17, 2000. Shaw filed his Motion for Devolutive Appeal on May 12, 2000.
SUMMARY JUDGMENT IN FAVOR OF HIBERNIA
Under the most recent amendments to the Summary Judgment law, La. C.C.P. art. 966, this court reviews Summary Judgment de novo, considering the same standards applied by the trial court in deciding a Motion for Summary Judgment. Plauche v. Bell, 99-0707, p. 2-3 (La.App. 4 Cir. 5/3/00), 762 So.2d 130, 133. Generally, a Motion for Summary Judgment may only be granted “[a]fter adequate discovery or after a case is set for trial.” La. C.C.P. art. 966(C)(1). La. C.C.P. art. 966(B) requires the party seeking Summary Judgment, who has the burden of proof, to show two things: (1) that “no genuine issues as to material fact” exist, and (2) that he “is entitled to judgment 'as a matter of law.” In order to meet his burden of proof, the mover is not required “to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense.” La. C.C.P. art. 966(C)(2). If the movant meets its burden of proving these two issues, the burden shifts to the party opposing the motion to “produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial.” Id. Summary Judgment is now a favored procedure in Louisiana. La. C.C.P. art. 966(A)(2).
LOn appeal, Shaw makes three basic arguments concerning the propriety of the trial court' judgment granting Summary Judgment in favor of Hibernia: (1) adequate discovery had not been completed; (2) genuine issues of material fact remained, and (3) Hibernia failed to prove entitlement to judgment as a matter of law.
Discovery
First, Shaw argues that the trial court improperly granted Summary Judgment in favor of Hibernia prior to completion of adequate discovery. The history of discovery in this case is complex, and review of the discovery issues is complicated by the numerous filings on every possible issue by every attorney representing every party in this case.[2] Nevertheless, as will be *141 come apparent, a review of the history of the discovery in this case is necessary to resolution of the Summary Judgment issue.
Prior to the filing of Shaw’s petition in July of 1996, on March 23, 1994, Oscar C. Russell, Jr., Hibernia Vice President who was terminated at the same time as Shaw, filed a Petition raising similar allegations to those raised by Shaw in the instant case. On January 23, 1997, the trial court signed a “Consent Order to Transfer,” transferring the Shaw case to the division of court previously assigned the Russell case. On November 13, 1997, the trial court issued an order consolidating the Russell and Shaw cases for purposes of discovery only. Following that order, some discovery motions, memoranda, and orders were filed |7in the record for the Shaw case, while others were filed in the record for the Russell case, further complicating this court’s review of the issues in this case.
Thereafter, a number of discovery motions were filed by Shaw and Russell, including two Motion[s] to Compel Production of Documents and Discovery, filed by Russell on November 11, 1997 and December 7, 1998, and a Motion to Compel Answers and Production of Documents Withheld on Grounds of Privileged Communication and Work Product, filed by Russell on January 5, 1999. All of those motions were pending on May 11, 1999, when Hibernia filed its Motion for Summary Judgment against Shaw. The Motions to Compel were granted in part and denied in part on December 9, 1999, allowing Russell and Shaw to discover some of the documents previously withheld by Hibernia. However, before any of those documents were produced, the finality of the portion, of the judgment granting the Motions to Compel was arrested by a Motion to Reconsider Portions of the Judgment filed by Hibernia on December 27, 1999. On March 7, 2000, the trial court entered written judgment granting the Motion to Reconsider, reversing her prior judgment granting Russell’s Motion to Compel certain documents, holding that those documents were privileged and therefore not discoverable. This court denied Hibernia’s Application for Supervisory Writs on that issue on June 20, 2000, finding no abuse of the trial court’s discretion. Although Shaw raises the propriety of the trial court’s denial of the Motions to Compel in the instant appeal, that .interlocutory order has previously been reviewed on supervisory writs by a panel of this court; Shaw’s arguments on that issue are therefore moot for purposes of this appeal.
|sNot only were Russell’s Motions to Compel pending at the time of the hearing on the Motion for Summary Judgment, but less than two weeks after filing its Motion for Summary Judgment, Hibernia filed a Motion for Protective Order to prohibit Shaw and Russell from using a June 3, 1991, letter from Hibernia In-House Counsel, James L. Rohwedder, to the Executive Compensation Committee of the Board of Directors of Hibernia Corporation concerning the validity under Louisiana state law of the Employment Agreements between Hibernia and members of *142 senior management. The trial court issued a written judgment granting Hibernia’s Motion for Protective Order on March 17, 2000, the same day that she entered Summary Judgment in favor of Hibernia and granted Hibernia’s Motion to Reconsider portions of the December 9, 1999 judgment on Russell’s Motions to Compel. However, on June 20, 2000, this court reversed the trial court’s granting of Hibernia’s Motion for Protective Order, stating as follows:
[Documents which the relator had in his possession during his tenure with the defendants, are not privileged because they pertained to the issue of the legality of his employment contract with the defendants. Without this information, the litigant may endure undue hardship or injustice considering that the validity of this contract is an integral part of his claim that the defendants unilaterally demoted or terminated him in violation of said contract.
Again, Shaw seeks review of the granting of Hibernia’s Motion for Protective Order relative to the Rohwedder letter in the instant appeal. However, since this court has previously reversed that interlocutory order on Russell’s Application for Supervisory Writs, that issue is also moot for purposes of this appeal.
On April 23, 1999, Hibernia filed a Motion for Protective Order to Prevent Plaintiff from Using Improperly Obtained Privileged Documents, apparently related to an “impeachment document”; that motion was set for hearing on May 21, 1999. However, two days after the filing of Hibernia’s Motion for Summary | Judgment, on May 13, 1999, Russell filed a Motion for Protective Order, seeking an order prohibiting the discovery of the impeachment document pending the taking of depositions of certain parties. Although hearing on Hibernia’s Motion for Summary Judgment had originally been set for July 2, 1999, on Hibernia’s Motion for Expedited Consideration, that hearing was postponed on Shaw’s motion. Instead, on July 2, 1999, the trial court heard Russell’s Motion for Protective Order. On August 23, 1999, Hibernia filed its own Motion for Protective Order to Postpone Premature Discovery, seeking an order postponing depositions of Hibernia’s witnesses, Robert Boh, Hugh Kelly, and Thomas Masilla, pending judgment on Russell’s Motion for Protective Order and review of that decision in this court. On October 1, 1999, the trial court granted Russell’s Motion for Protective Order, allowing Russell to withhold the impeachment document “until immediately following the completion of relevant depositions by the Petitioner of the principals Robert Boh, Hugh Kelly, Thomas Ma-silla, James Stone, and Sidney Lassen.” Apparently, Hibernia’s Motion for Protective Order became moot at that time. The trial court denied Hibernia’s Motion for Stay Pending Adjudication of Defendant’s Application for Supervisory Writs to the Louisiana Fourth Circuit Court of Appeals. Nevertheless, it is undisputed that none of the depositions listed by the trial judge were taken prior to March 17, 2000, when the trial court granted Hibernia’s Motion for Summary Judgment. According to Shaw’s brief to this court, Russell produced the impeachment document to Hibernia at Sidney Lassen’s deposition on March 20, 2000, three days after the trial court granted Hibernia’s Summary Judgment. Although Shaw claims he was prohibited from participating in Lassen’s deposition, he nevertheless received a copy of the impeachment document on March 21, 2000. Thus, Shaw’s ^arguments concerning his right to obtain the impeachment document are now moot also.
On November 18, 1999, Shaw filed a Motion for Expedited Hearing On Mo *143 tion for Relief in Aid of Discovery, seeking an order allowing him to “interview” certain former Hibernia employees, who were his co-employees at Hibernia, despite the existence of confidentiality provisions in all of their termination agreements with Hibernia. The trial court issued a written judgment denying that motion on March 17, 2000, the same day she granted Summary Judgment in favor of Hibernia. The trial court held as follows:
IT IS FURTHER ORDERED that plaintiffs be and hereby are prohibited from meeting with and/or otherwise interviewing any current or former employee of the defendants other than through questioning undertaken as part of a properly noticed deposition conducted in accordance with the Louisiana Code of Civil Procedure.
Although Shaw raises the trial court’s denial of his Motion for Relief in Aid of Discovery in the instant appeal, his attorney indicated at oral argument before this court that Shaw’s primary concern is the fact that he was not given the opportunity to conduct the depositions anticipated by the trial court’s judgment prior to the granting of Hibernia’s Summary Judgment. At any rate, we find no abuse of the trial court’s discretion on this issue. The trial court properly restricted Shaw’s right to “interview” his co-employees to properly-noticed deposition testimony. Only deposition testimony could have been used by Shaw to defend against Hibernia’s Motion for Summary Judgment; being allowed to informally “interview” his co-employees would have no effect on the result of the Motion for Summary Judgment.
Although the language of La. C.C.P. art. 966 does not grant a party the absolute right to delay a decision on a Motion for Summary Judgment until all In discovery is complete, the law does require that the parties be given a fair opportunity to present their case. Rumore v. Wamstad, 99-557, p. 7 (La.App. 5 Cir. 2/8/00), 751 So.2d 452, 456, citing Simoneaux v. E.I. du Pont de Nemours and Co. ., Inc., 483 So.2d 908 (La.1986). As clearly demonstrated by the above discussion of the amount of discovery on-going at that time, adequate discovery had not been completed prior to the trial court’s entry of Summary Judgment in favor of Hibernia. In fact, the record clearly demonstrates that the trial judge found that Shaw had the right to take numerous depositions-both the depositions of the Hibernia witnesses and the depositions of Shaw’s coworkers, then failed to afford him a reasonable opportunity to take those depositions prior to being required to defend against Hibernia’s Motion for Summary Judgment. Accordingly, we reverse the trial court judgment granting the Motion for Summary Judgment as premature.
Genuine issues of material fact
Shaw also argues that genuine issues of material fact exist making Summary Judgment inappropriate in this case. In support of its Motion for Summary Judgment, Hibernia referred the trial court to Mr. Shaw’s statements in an September 9, 1997, deposition that, sometime in late June or early July of 1991, he told Hibernia Board Chairman Masilla that he wanted to resign because he “didn’t want to work there anymore” because “he didn’t enjoy it anymore” and because “it wasn’t pleasurable.” The reason for his dissatisfaction, according to Shaw’s deposition, was “too much government involvement.” In granting Summary Judgment in favor of Hibernia, the trial court focused on the above testimony, stating, in pertinent part, as follows:
hi>[T]he argument that the Court is, had a problem with, and I didn’t feel that counsel in it’s [sic] brief or with any of *144 it’s [sic] documents were [sic] able to overcome where [sic] the statement of Mr. Shaw, relative to his reasons for leaving the bank and participating in the severance package that he did. It’s the Court’s belief that, and Mr. Gambel indicated in his memoranda that there should be additional time to take depositions of other officers or other persons of the Bank to determine about the mistake or potential for mistake. However, the records seem to clearly show that Mr. Shaw did not make his decision based upon any of these mistakes, but made his decision based upon his desire to leave the banking industry as he saw it becoming an over-regulated body. I read through the deposition and I thought initially that at first, maybe Mr. Shaw may have thought the he may gave gotten confused during the deposition questioning, but the questioning, as I read it, made it very clear he was asked several times about his reasons for wanting to leave the Bank and he said over and over again he just got tired of the banking industry. He got tired of government involvment [sic]. He got tired of over-regulations and he didn’t enjoy working there anymore and wanted to leave, and in fact said he wanted to stop work. I don’t know that any further depositions are going to change that. Now, he attempted to change some of it by his affidavit. The majority of the affidavit relate to things that he learned subsequent thereto, not things he was aware of at the time about which he was mistaken or about which there was a mistake. It’s been suggested that there was a mistake, and as counsel pointed out for Hibernia, mistake as to law are not sufficient to over, to rescind the contract. It would have to be some material mistake as to fact. None have been pointed out to the Court.
Shaw claims that his termination, as well as the termination of other members of Hibernia senior management, was initiated by a group of members of the Hibernia Board of Directors, who Shaw refers to as a “Rump Committee.” According to Shaw, the members of the Rump Committee held at least two board meetings in 1991 without his knowledge or the knowledge of other members of the board who were also a part of senior management. Shaw claims that the board discussions at those meetings were “part of a clandestine effort to oust him from the Bank so that the Bank could be downsized, and the termination payment due him under his contract avoided.”
[ ^According to Shaw, the Rump Committee improperly induced members of senior management to accept and agree to the termination letter by leading them to believe that their Employment Agreements were illegal and/or unenforceable under federal banking law. In furtherance of this scheme, Shaw claims, the Rump •Committee led members of senior management to believe that the Office of Commissioner of Compensation (“OCC”) had raised the issue of the validity of their contracts. According to Shaw, the Rump Committee regarded the contracts of members of senior management as an impediment to a desired sale of Hibernia.
Hibernia indeed claims that its actions were required by the OCC, asserting that beginning in 1991 the OCC leveled substantial claims against Hibernia and its operations, including the effectiveness of its management. According to Hibernia, the OCC made several recommendations to the Board to address OCC’s concerns about the “incompetency” of Hibernia’s management and a perceived lack of proper Board oversight of management. In fact, Hibernia says, the OCC issued an ultimatum, giving the Board three options: *145 (1) dump management, (2) restructure management, or (3) become more involved. The Board chose the third option, Hibernia claims, and became more involved.
Nevertheless, Hibernia asserts that the OCC eventually directed Hibernia to rescind the contracts of senior management immediately. The Board then sought to implement standardized Employment Agreements for Hibernia’s thirty most senior executives, including Shaw. The OCC directives, Hibernia says, prevented it from funding Shaw’s golden parachute. Although Hibernia prepared a substitute employment contract for Shaw, Shaw declined the contract and announced his decision to resign his position. Hibernia and Shaw then negotiated the terms of a July 19, 1991, letter whereby Shaw received the balance of his contract for 1991, ]14and other valuable benefits, valued at more than $500,000, Hibernia claims. Shaw’s decision to resign was voluntary.
On the other hand, Shaw claims that discovery documents show that Hibernia, not the OCC, initiated the issue of the validity and enforceability of the termination guarantees in a conversation with the district administrator of the OCC concerning methods they could use to avoid complying with the “golden parachute” liquidated damages provisions in the Employment Agreements with members of senior management. Shaw claims that he was not given copies of the letters between members of the Hibernia Board and the OCC because they would have disclosed that discussions concerning the sale of Hibernia had prompted discussions about his contract. Shaw claims that Hibernia did not proceed in good faith because he was mislead to believe that the OCC had initiated termination of his Employment Agreement and that the OCC had declared the golden parachute provisions illegal or unenforceable. Thus, he was improperly induced to resign and forfeit his fully-enforceable and entirely-legal contractual rights regarding the liquidated damages due under the agreement. His termination letter was procured as a result of ill-practices, deceit or fraud.
In brief, Shaw raises a number of genuine factual issues that remain to be decided in this case. Por example, he claims that his statements in his 1997 deposition testimony that he decided to resign from Hibernia because of excessive government involvement are not inconsistent with his claim in the instant case that he was induced to resign by the representations of members of the Rump Committee that the OCC had taken the position that his Employment Agreement was illegal and unenforceable. The representations by members of the Rump Committee that the OCC had taken the position that Shaw’s Employment 11RAgreement was invalid and unenforceable were the exact “government involvement” that lead to Shaw’s decision to resign, he says. Shaw also claims that he did not automatically forfeit his right to liquidated damages under the provisions of his Employment Agreement when he resigned in July of 1991 because he had already been constructively terminated by Hibernia when he was involuntarily stripped of his duties when the Rump Committee took over Hibernia operations on May 23,1991.
Hibernia also raises some genuine issues of material fact that remain to be determined in this case, including the effect of the release and settlement provision in the termination letter signed and accepted by Shaw. That issue is juxtaposed against Shaw’s claims that Hibernia representatives induced his resignation by failing to disclose material information about the pending sale of the bank and other issues that might have produced a different response or decision on Shaw’s part. Hibernia does not seriously challenge Shaw’s *146 claims that he was not fully informed of all the considerations underlying Hibernia’s decision to offer Shaw a substitute contract. Because of these and other factual issues not addressed by the trial court, our de novo review of the proceedings below convinces us that genuine issues of material fact concerning the events surrounding Shaw’s resignation from Hibernia exist. Accordingly, we reverse the Summary Judgment for that reason also.
Legal issues
Finally, Shaw claims that the trial court improperly granted Summary Judgment in favor of Hibernia because Hibernia failed to prove that it was entitled to judgment as a matter of law. Shaw raises a number of legal issues to be decided, h ¿including the following: (1) error, (2) fraud, (3) misrepresentation, and (4) estoppel. Hibernia’s arguments add two other legal issues to the above list: (1) the common law “tender back” doctrine and (2) preemptive federal banking law
In her oral reasons for judgment, the only legal issue addressed by the trial judge was the “tender back” issue, and she decided that issue against Hibernia, stating that “it’s not clear on the law that there should be a tender-back.” The trial judge also mentioned the duress and fraud issues, but only to say that Shaw had failed to present evidence on those issues. Of course, we have already held that the trial court’s consideration of the Summary Judgment prior to the completion of adequate discovery was premature and that genuine issues of material fact remain. Accordingly, we find that Hibernia failed to carry its burden of proving that it was entitled to judgment as a matter of law, again making Summary Judgment inappropriate.
Conclusion
The case is remanded to the trial court for further proceedings consistent with this opinion. Shaw is to be afforded adequate time to complete the depositions of the Hibernia witnesses, as well as the depositions of his former co-workers, prior to future proceedings on Hibernia’s Motion for Summary Judgment. Moreover, Shaw is entitled to use both the Rohwedder letter and the impeachment document, which are not exempt from discovery, to defend against the motion. All costs of this appeal are assessed to Hibernia.
REVERSED; REMANDED.
MURRAY; J., concurs in part with reasons.

. Shaw also mentions, but does not assign as error, a May 5, 1997, trial court judgment granting Hibernia’s dilatory exception of failure to plead fraud with particularity. This court will not consider that issue both because it it was assigned as an error and because Shaw failed to timely seek review of the judgment by filing an application for supervisory writs.

. The number and extent of filings to this court while the appeal was pending illustrates the degree of advocacy in this case. In fact, the attorneys repeatedly violated the Uniform Rules-Courts of Appeal with their excessive pleadings relative to the issues in this appeal. For example, Rule 12 restricts original briefs on 8-1/2" x 14" paper to 25 pages and requires that motions for leave to file briefs in excess of the page limitations be filed at least *141 ten days in advance of the due date of the brief. Shaw filed two briefs-an original brief with 37 numbered pages and a reply brief with 32 numbered pages. Hibernia also filed two briefs-an original brief with 82 pages, and a supplemental brief with 20 pages. Although the parties did sometimes seek leave to file briefs in excess of the page limitations, none of those motions were timely filed ten days before the due date of the brief. Moreover, the Court Rules contain no authority allowing Hibernia to file a "supplemental” brief.